**Chryst v. Chryst.**

8

*David S. Sobotka,* for plaintiff.
*Mary C. Favinger,* for defendant.

LASH, *J.,* June 7, 2012—David S. Sobotka, Esquire, attorney for plaintiff, Thomas E. Chryst. Mary C. Favinger, Esquire, attorney for defendant, Brenda Chryst.

The matters before this court are the petition of defendant, Brenda Chryst (hereinafter "mother"), to modify the child custody order entered on October 25, 2010, after trial held, and the counterclaim of plaintiff, Thomas E. Chryst (hereinafter "father"), also seeking to modify the aforesaid order. Trial was held on May 25, 2012. The court enters the following Findings of Fact:

## I. FINDINGS OF FACT

1. Plaintiff, Thomas E. Chryst (hereinafter "father"), is an adult individual who resides at 5911 Shepherd Hills Avenue, Lower Macungie Township, Lehigh County, Pennsylvania.

2. Defendant, Brenda Chryst (hereinafter "mother"), is an adult individual who resides at 202 Cinder Street, Birdsboro, Berks County, Pennsylvania, 19508 since July 2010.

3. The parties are the natural parents of a minor child, F.M.A.C., born May 14, 2008, (hereinafter "minor child").

4. Father resides in the East Penn School District and mother resides in the Daniel Boone School District.

5. The parties were married on November 5, 2005, separated in December 2006, and were divorced on June 6, 2008.

6. Since her birth, the minor child has resided primarily with mother.

7. This court action was initially commenced by father, resulting in a trial before this court on October 1 and October 8, 2010. The court entered a decision and order on October 25, 2010, which is incorporated herein by reference and made a part hereof, setting forth, among other things, that the parties would share legal custody, that mother would have primary physical custody, and that father would have custody the first three (3) weekends of each month from Thursday at 3:00 p.m. until Sunday at 12:00 noon, and at such times as the parties may agree. The order also provided that the parties would engage in co-parenting counseling, and that father would not permit

his friend, Barbara Whitacre, to be present when father had custody of the minor child or otherwise have any access to the minor child.

8.   Father is retired. Formerly, he was employed at Air products & Chemicals, Inc., as a senior tax manager.

9.   Mother is employed through the Commonwealth of Pennsylvania as a secretary to the Honorable James Stapleton, W.C.J. Her official work hours are Monday through Friday from approximately 8:30 a.m. until 4:30 p.m. She is currently working part-time, having obtained leave through the Family Medical Leave Act due to her suffering with insomnia and depression. She works generally on Mondays through Fridays from 10:30 a.m. to 4:30 p.m.

10.   Mother has been diagnosed with major depressive disorder. She has been in therapy with David Knotts, M.A., Dmin., a licensed psychologist, since March 1, 2007. Additionally, she had been treating with Kathleen M. Hummel, M.S., C.A.C., since December 2, 2008. She takes Wellbutrin to address her mood and anxiety issues.

11.   The minor child attends daycare at Kindercare in Wyomissing, Berks county, Pennsylvania. Her attendance has been sporadic, primarily due to mother's increased availability to care for the minor child while she is on Family Medical Leave.

12.   Father currently resides alone in a ranch home in a suburban area, with his property abutting a golf course. The house is suitable for the care of the minor child.

13.   Father was married previously to Colleen Mullins Chryst. They were separated in November 2003, becoming

divorced in September 2005. Father has two (2) adult children from this marriage, Abby Chryst, born October 13, 1983, and Allyson Chryst, born August 29, 1985.

14. Father and his former wife, Colleen Mullins Chryst, maintain a good relationship, even to the extent that his former wife provides father with home cooked meals approximately once a week.

15. Mother resides with the minor child, as well as her adult daughter from another relationship, Preness M. Graham, born September 7, 1989.

16. The parties reside approximately 50 minutes apart.

17. For purposes of the first trial, this court appointed Ivan L. Torres, Ed.D., of Alpha Counseling and Mediation Center, Inc., to perform an independent psychological evaluation. He provided a written report dated March 30, 2010. For the within trial, Dr. Torres performed a "custody re-evaluation," providing a written report and testimony at trial. For the re-evaluation, he interviewed the parties, the minor child, mother's other child, Preness, father's adult child, Allyson Chryst, father's ex-wife, Colleen Mullins Chryst, and father's friend, Barbara Whitacre.

18. This court was not provided with independent evidence regarding the suitability of mother's household, for she refused to allow Dr. Torres to view her premises.

## II. DISCUSSION

Both parties seek primary physical custody. In making disposition, this court considered the testimony of the parties, father's ex-wife, Colleen Mullins Chryst, father's

adult daughter, Allyson Chryst, mother's adult daughter, Preness M. Graham, the testimony and evaluation of Dr. Torres, and the exhibits filed by the parties.

This trial was somewhat unique, being held less than two (2) years from the time of the first trial when the parties had a full opportunity to present their respective positions. Accordingly, a substantial portion of the facts and circumstances are the same as they were at the first trial. To their credit, counsel for the parties did not simply rehash what was gone over beforehand.

There have been some changes. Father is now retired, available full-time to care for the minor child. He states that he has, for some time, been seeking a "second career," but did not know what that career would be. He has come to realize that his "second career" is that of a father to the minor child. He seeks to do this on a full-time basis.

Another change concerns mother's incapacity. Since the time of the first trial, she has sought leave under the Family Medical Leave Act, to enable her to work when she is able. She suffers from depression and insomnia. Currently, she starts work at about 10:30 a.m. On the issue of custody, mother urges that this enables her to spend time with the minor child during the morning hours. Father, on the other hand, points out that mother's hours at work have continued to decrease, and wonders whether mother is capable of performing all the necessary duties of a parent. Father also is concerned with the minor child's inconsistent schedule, for mother takes her to daycare on an as-needed basis, sometimes only one (1) day a week. As such, the minor child does not receive the educational instruction provided by the daycare in the

morning sessions.

Another change which concerns father is the fact that mother's other daughter, Preness, is enrolled to commence college in September at the Pittsburgh institute of Mortuary Science. Preness testified that she would be relocating to Pittsburgh. Mother, however, intimated that some of the courses would be taken online, enabling Preness to remain home. Father wonders how mother will be able to cope with the care of the minor child without the continued assistance of Preness, who has been a resource in the daily care of the minor child. In a similar vein, father's daughter, Allyson, has now moved to Pottsville. Allyson had developed a good relationship with the minor child and had assisted father during his period of partial custody. Allyson's involvement will now be much more limited.

Another circumstance of note is the continued inability of the parties to work together. The condition has worsened. For one, the parties either could not or would not accept any instruction from the co-parenting counselor. In fact, it took them nearly a year to get the co-parenting counseling scheduled.

There are also problems when the parties meet to transfer custody of the minor child. On one occasion, mother telephoned father to advise him she was on her way. Father waited for a second telephone call to advise him that she was near or at the site of the exchange, but did not receive the call. Mother testified that she did call on both his landline and cell phone, that he did not pick up the phone, and that there was no ability for her to leave a message. She contacted the police, who eventually

had to get involved. Father testified that mother never called him on the landline. Further, father has a policy, for reasons he did not disclose, that he does not turn on his cell phone, except when he needs to use it. Father states that mother is aware of this policy. Father surmises that mother deliberately attempted to call him on his cell phone, knowing he would not pick up the phone, so that she could complain to the police try to get him in trouble. In any event, the police were involved, and the fiasco took several hours to resolve.

Father complained that mother scheduled a one (1) day vacation, specifically choosing the day of father's family reunion. Father argues that this was inappropriate and deliberate, an attempt by mother to keep the minor child from his family.

Another issue which has arisen is the minor child's weight gain. Both parties acknowledge that the minor child is overweight, each accusing the other of feeding the minor child junk food, while insisting that the food each feeds her is nutritious and appropriate.

The parties were not forthcoming in providing evidence to the court . Mother refused to allow Dr. Torres into her home for a home inspection. She stated that she does not trust Dr. Torres, alleging he made statements in the first trial which were inaccurate. For his part, father, whose testimony at the first trial was evasive, was again evasive on cross-examination.

In his first evaluation, Dr. Torres provided a recommendation, opining that a shared custody arrangement would be appropriate. In the re-evaluation, Dr. Torres did not provide a recommendation on a schedule but focused

on specific problem areas which needed to be addressed if the minor child is to enjoy a healthy relationship with her family members. Regarding mother, he primarily concentrated on her mental health. He documented her history of depression and treatment. He emphasized his concern that mother, a sexual abuse victim, has not sought therapy to address the effects of the abuse. In his first report, he recommended that she, as well as Preness, also a sexual abuse survivor, address the problem immediately, concerned that these dynamics represent risk factors for the minor child, both in mother's capacity to parent and to provide a safe environment for the minor child. Her failure to seek treatment was disappointing.

Dr. Torres also mentioned mother's refusal to allow him to view the inside of her home. In the first evaluation, he had inspected her prior home, finding the home to be cluttered and her housekeeping wanting, drawing the inference that it is likely that her housekeeping has not shown improvement.

Regarding father, Dr. Torres' main concern is his controlling, authoritarian demeanor. In the past, father's actions alienated him from his daughters from his first marriage. Mother, as well as father's first wife and his daughter, Allyson, expressed concerns that his controlling behavior could resurface in the future, particularly as the minor child becomes more independent. Dr. Torres states: "At this time it is clear that [father] is the subject of love and affection from his daughter.... given her age and total dependency on him, he appears to genuinely enjoy his daughter. However, all the females interviewed for this reevaluation concurred that as [the minor child] begins to show emotional emancipation, [father] will begin to

demonstrate his need to control and bully her."[1]

Dr. Torres also speaks about father's ability to "create barriers." For example, he cites father's refusal to utilize his cell phone to "communicate last moment details to assure a smooth transition of the child from his care back to [mother], [which] demonstrates disregard for his daughter's emotional safety."[2]

Dr. Torres interviewed the father's friend, Barbara Whitacre. After the first trial, this court ordered that Ms. Whitacre was to have no contact with the minor child. Father gave the impression that the relationship had ended and that the order was being honored. However, in her interview with Dr. Torres, Ms. Whitacre stated that she and father had "previously reunited," spending time together primarily to attend sporting events. She categorizes herself and father as "good friends."

Dr. Torres recommended that the provision in the previous court order denying Ms. Whitacre access to the minor child should remain in force. Although father appears to have no problem with Ms. Whitacre, mother maintains serious objections. As Ms. Whitacre has no standing to demand interaction with the minor child, Dr. Torres believes that, for the minor child's sake and to remove additional friction between the parties, Ms. Whitacre should have no involvement with the minor child.

Dr. Torres did make several recommendations to assist the parties in proper parenting. This included sharing important information on a regular basis, providing

1. Custody Re-evaluation, p. 37.
2. Custody Re-evaluation, p. 38.

normal rules of phone communication, including use of the cell phone, requiring that any adult who becomes involved in either the child care or with either of the parents should be evaluated to determine the function and level of the party, requiring that no one other than the parties, the professional caregivers, Colleen Mullins Chryst, Allyson Chryst, and Preness M. Graham should be part of the minor child's care, directing that pediatric and dietetic services should be sought to create a plan of nutritious food and physical activity to address the minor child's weight problem, requiring that the parties should participate in co-parenting services to teach them "new cognitive behavioral skills necessary to negotiate and mediate their differences and offer [the minor child] safe, stable and nurturing relationships, and recommending for a second time that mother and Preness enter into a treatment program for survivors of sexual abuse. He also urges father to enter into an anger management program to address the cognitive behavioral deficits resulting in "females in his family accusing him of bullying conduct and creating adverse conditions for his daughter."

Dr. Torres cites a study, known as the Adverse Childhood Experiences (ACE) study, conducted by the Center for Disease Control to consider associations and problems experienced by a person during childhood which impacts on the person's health and well-being. Dr. Torres' assessment of the parties in the context of this study causes him to reach this conclusion: "According to the results of this research, the short and long-term outcomes of these childhood exposures forecast a multitude of health and behavioral problems for [the minor child]. Compared to this study sample by the CDC [Centers for Disease

Control], the [minor child] is living in households that have combative parents, a mother with Mental Health problems, a father who is highly controlling and female careproviders who have un-addressed histories of sexual victimization [mother, Preness and Barbara Whitacre]."

At issue is primary physical custody. The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello*, 446 Pa.Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa.Super. 381, 385, 659 A.2d 1040, 1042 (1995).

In 23 Pa.C.S.A. Section 5328, the General Assembly has enumerated certain factors to consider when awarding custody, if relevant, giving weighted consideration to those factors which affect the safety of the minor child.

The first issue concerns "which party is more likely to encourage and permit frequent and continuing contact between the child and another party." This is one area of great concern to the court . The parties refuse to cooperate and have taken steps to limit contact. Mother claims that she wants the minor child to have a good relationship with her father. However, she has acted in a contrary manner, restricting access. One example is her decision to take a vacation day on the very day father wanted to take the minor child with him to his family reunion. This is not an isolated incident, as this same type of conduct was cited against mother at the first trial.

There are also logistical concerns due to the distance between the parties' residences and mother's transportation limitations, as she claims her vehicle is unreliable. Also exacerbating the situation was a Protection From Abuse order entered against mother by Lehigh County court.[3] This was the reason for the parties meeting at the Fogelsville Police Station. It became evident that requiring the parties to communicate effectively, was fraught with problems.

The father is hardly accommodating. He was also accused of manipulating the vacation schedule to restrict mother's access to the minor child. His policy of keeping his cell phone off while mother is en route to transfer the minor child to him is troubling. In essence, this court has no confidence that either party, at this juncture, would do anything more than what is required by court order to assist the other party in maintaining contact with the minor child. Accordingly, this factor does not favor either party.

The next factor addresses the "present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child." There have been no allegations of abuse of the minor child by either party. As stated, mother was restricted from contact with father through a Protection From Abuse order entered by Lehigh county court . This stemmed from the volatile relationship between the parties and mother's inability to control herself. Since the relationship has not improved, there is always the possibility that there will be additional

3. The Order has now expired.

problems. Father has at least been able to refrain from crossing the line into committing abuse against mother, although there were allegations against him at the first trial regarding abuse against his daughter, Allyson. This factor favors father but only slightly.

The next factor concerns "the parental duties performed by each party on behalf of the child." Mother has always been the primary custodian. She has been the parent who has handled the daily maintenance and routine for the minor child.

Mother is concerned that father is not adequately equipped to handle these concerns. She believes that father does not provide a proper diet, as evidenced by the minor child's weight gain since she has started spending time with father. Mother also urges that father would be ill equipped to assist in providing the minor child with a proper bath.

Father contends that he should have the opportunity to perform the daily parental duties. As stated, he contends that mother's choice of diet has caused the weight problems. He also argues that mother has thwarted the minor child's educational experience by allowing her to stay home rather than attend the educational classes at Kindercare.

This factor favors mother slightly because she has been the primary caregiver and has always been very invested in the minor child's daily care. However, with her incapacities, there is an increasing lack of consistency. Further, she has had to rely on Preness to assist in the care, which may no longer be an option if preness does, in fact, relocate to Pittsburgh for college. Father has not

had the opportunity, nor the experience, to be a full-time parent. Further, he appears willing to delegate these types of responsibilities to others. It is interesting that he has chosen to pay his former wife to cook his meals rather than handle the matter himself. The absence of Allyson as a contributor to the care is also of slight concern. This factor is weighed slightly in factor of mother, the weight being diminished by her lack of structure.

The next issue addresses "the need for stability and continuity in the child's education, family life and community life." One of father's primary attributes is his orderly lifestyle. There is no doubt that should father obtain custody, a consistent routine will develop in all aspects of the minor child's life. His house and the surrounding environment is also very suitable for rearing the minor child. Mother, on the other hand, has a lifestyle that is spontaneous and sporadic. Part of this is due to her depression and insomnia and part of it is due to her personality. If mother continues with custody, it is unlikely that the minor child will have any type of an established routine. Her schedule will be dictated based upon mother's circumstances. This factor favors father.

The next factor concerns "the availability of extended family." father's extended family, particularly his former wife, is a positive. Father wants to have the minor child become involved with other members of his family, but as stated, mother has imposed some restrictions. The minor child has not developed a relationship with any member of mother's extended family. Accordingly, this factor favors father.

The next factor addresses "the child's sibling

relationships." The minor child has a good relationship with her half-sister, Preness, as well as her half-sister, Allyson, both of whom, unfortunately, may be spending less time with her, for reasons already set forth. This factor does not favor either party.

The next factor, "the well-reasoned preference of the child," was not considered, as the minor child was deemed too young to testify or express an opinion.

The next factor addresses "the attempts of a parent to turn the child against the other parent." Some of mother's conduct could be attributed to an agenda of alienation. More likely, however, the acrimony stems from the parties' inability to get along or work together. This factor does not favor either party.

The next factor concerns "which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs." From the very beginning, mother has exercised extensive devotion to this minor child, showing her love, warmth, and a capacity to nurture. In that sense, mother's relationship is very positive. However, the evidence also suggests that mother's devotion may extend beyond what is acceptable to the point where it may even be smothering. The minor child sleeps in mother's bed with her, not in her own bed. It appears that the minor child's presence is therapeutic to mother, alleviating her stress levels.

Father has also established a loving relationship with the minor child. If the relationship continues as it is now, the relationship is a healthy one. However, if father's demeanor becomes authoritarian and controlling in

response to the minor child's developing independence, as it did with father's other children, the relationship will be severely compromised. There should be no reason that father cannot modify his behavior, given his level of intelligence, the extensive warnings given by his family and Dr. Torres, and the fact that there is time to adjust. Really, the only question is whether father is too obstinate to recognize that he has a problem. In essence, at this juncture, both parties provide sufficient love and nurturance for the minor child but both have issues that must be addressed. This factor favors neither party.

The next factor addresses the question of "which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child." Mother is more capable of attending to the minor child's daily physical needs. Neither party is particularly suited to addressing the minor child's emotional needs, as they have their own set of issues, and to this point, have, through their acrimony, adversely affected the minor child's emotional health. Father is more suited for assisting the minor child with her developmental and educational needs, given his capacity for order, continuity and stability. Overall, this factor favors father.

The next factor addresses "the proximity of the residences of the parties." This has been a problem area for the parties, due to the distance between the residences and due to mother's transportation issues. This factor favors father, for this problem was, in part, exacerbated by mother's own conduct. For one, as a responsible parent and a person holding down a full-time job, she should ensure that she has reliable transportation. Further, immediately prior to the first trial, mother moved from Sinking Spring

to the Birdsboro area. This move increased the distance between the parties' residences. Mother could have moved to another home in Sinking Spring, Spring Township or another area such as Muhlenberg Township, which would have been just as close to Reading, her city of employment, and would have been much closer to father's residence. Of course, there are many considerations which go into choosing a residence, but mother provided no specific reason, compelling or otherwise, that would assist this court in understanding her decision to move to Birdsboro. This factor favors father.

The next factor relates to "each party's availability to care for the child or ability to make appropriate child-care arrangements." This is one of the cornerstones of father's argument. He has retired and considers his role as a parent to be a "second career." Accordingly, he intends to be available for the minor child at all times. For her part, mother has always been available or been able to make arrangements, primarily through Kindercare, but also through the help of her daughter, Preness. Based on father's commitment and his ability to maintain stability, and due to mother's sporadic use of Kindercare, resulting in the minor child not being able to enjoy the full benefit, this factor favors father.

The next factor concerns "the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another." As already set forth, this cooperation is nonexistent. It would be one thing if the parties were young parents in their late teens or early 20's, where the maturity level and capacity to parent a young child may not be fully developed. However, here we have two parents who are middle aged, father being 55 years

old and mother being 44 years old. Both have already experienced the parenting process, being the parents of adult children. Accordingly, the continuing animosity is inexcusable. Further, each parties' stubbornness is well anchored, to the extent that co-parenting counseling was completely unsuccessful and will not be recommended by this court in the future, for it is simply a waste of time and money. This factor favors neither party.

The next factor relates to "the history of drug or alcohol abuse of a party or member of a party's household." Fortunately, this does not appear to be a concern in either household.

The last factor relates to "the mental and physical condition of a party or member of a party's household." Neither party has expressed any physical limitations. Mother's mental health, however, is a continuing cause of concern. It has affected her ability to work. It has impacted on her capacity to operate an efficient and orderly household. When she is suffering from insomnia or depression, it must impact on her ability to function as a parent. Mother needs to continue in her treatment to address these problems to prevent these problems from becoming totally debilitating. This factor favors father.

This analysis is difficult. Each parent has dysfunction which could adversely affect the minor child. The parties stubbornly refuse to work with each other for the benefit of the minor child. There are logistical problems which complicate the schedule and make it more difficult to effectuate a smooth custodial transfer. Moreover, these matters are considered in the context of the care of a child who is very young and impressionable and who

can be greatly impacted by the dynamics of the custodial arrangement and the issues caused by the parties.

This court gave consideration to awarding primary custody to one parent, with the other parent to have limited access. This would reduce the problems stemming from the acrimony and logistics. Further, the minor child would be able to adapt to the lifestyle of the custodial parent, clearly beneficial when you consider the great disparity between these parties in their lifestyles and parenting philosophies.

More crucial, however, is the need for this minor child to continue with a good relationship with both parents. This overrides all other concerns. The love and affection she receives from both parents and the bond that has developed should not be compromised by a schedule. Accordingly, restricting one parent from having access to her would not be advisable.

For these reasons, this court will grant custody on a 50/50 basis from now until the minor child starts full-time school for the 2013-2014 school year, and will also award 50/50 custody during the summer months. Once the minor child begins school, she will reside primarily with father, with mother having three (3) weekends a month and extensive time during the Christmas and Spring Break holidays. The school year schedule was chosen to provide father access to the minor child during weekdays when the continuity and stability that father exhibits can be best utilized for the minor child's educational development. Meanwhile, mother would have weekends where she and the minor child can enjoy the effervescence of their relationship, with extensive quality hours. This will also

allow mother to be free of her parenting duties during the week, so that she will be better able to concentrate on resolving her mental health issues and resuming her work schedule. To further assist mother and due to father's availability, father shall provide all transportation.

This court enters the following order:

## Order

And now, this June 7, 2012, after trial held, custody of the parties' minor, F.M.A.C., born May 14, 2008, (hereinafter "minor child"), shall be as follows:

1. The parties shall share legal custody.

2. From the date of this order until one (1) week prior to the commencement of the 2013-2014 school year, the parties shall share physical custody. The schedule is constructed over a two (2) week period, with the parties to each receive custody for seven (7) of the fourteen (14) days as follows: in week one (1),[4] plaintiff, Brenda Chryst (hereinafter "mother"), shall have custody from Thursday at 6:00 p.m. to Sunday at 6:00 p.m., and in week two (2), mother shall have custody from Thursday at 6:00 p.m. to Monday at 6:00 p.m. Plaintiff, Thomas E. Chryst (hereinafter "father"), shall have all other times.

3. Commencing one (1) week prior to the start of the 2013-2014 school year, father shall have primary physical custody. Mother shall have partial physical custody from Fridays at 6:00 p.m. to Sundays at 6:00 p.m. on the first, second, and third full weekend of each month. During the spring break, mother shall have custody commencing

---

4. Week one (1) commences June 14, 2012.

at 6:00 p.m. on the last day of school until 6:00 p.m. on the day prior to the start of school. During the summer months, the shared physical custody schedule as set forth in paragraph 2 shall resume.

4. Regarding the Christmas holiday, for 2012, mother shall have custody from Christmas Eve at 1:00 p.m. to Christmas Day at 1:00 p.m., and father shall have Christmas Day at 1:00 p.m. to December 26 at 1:00 p.m. Regarding the Christmas holiday for 2013 and thereafter, father shall have custody of the minor child from December 24 at 1:00 p.m. until Christmas Day at 1:00 p.m., then mother shall have custody from Christmas Day at 1:00 p.m. until one (1) day prior to the start of school, with the minor child to be transferred at 6:00 p.m.

5. The parties may modify this schedule by written agreement.

6. The parties shall alternate the following holidays from 9:00 a.m. to 7:00 p.m., with mother having the next holiday after the date of this order: Easter, Memorial Day, July 4th, Labor Day, and Thanksgiving.

7. Mother shall have custody on Mother's Day and father on Father's Day each year from 9:00 a.m. to 6:00 p.m.

8. Each party shall be entitled to two (2) weeks of custody time for vacation purposes during the summer months. Each party shall provide at lea7st sixty (60) days written notice of the dates and times for said vacation. The vacation shall be either two (2) non-consecutive weeks of seven (7) days each, or one (1) fourteen (14) day vacation period. If the parties' vacation schedule conflicts, mother's

choice shall take preference in odd-numbered years and father's in even-numbered years.

9. The holiday and vacation schedules shall take precedence over the regular custody schedule.

10. Father shall provide all transportation, picking up the minor child and dropping her off at mother's house.

11. At no time shall father or anyone permit Barbara Whitacre to have any contact with the minor child, either directly or indirectly.

12. Mother shall continue in therapy for her depression and insomnia disorders and shall continue to take medication as prescribed.

13. Father shall begin counseling with a psychologist to address and resolve any personality disorders which could affect his parenting, including, but not limited to, his capacity to be authoritarian and controlling.

14. If either party is planning to relocate with the child and the relocation will significantly impair any other party's exercise of custodial rights, the relocating party is obligated to provide a detailed notice and counter-affidavit by certified mail, return receipt requested, to all individuals who have custody rights to the child at least sixty (60) days in advance of the proposed relocation in compliance with 23 Pa. C.S.A. Section 5337.

15. The attached appendix shall be made a part of the within order.

16. This order shall be considered a final order finally resolving the issues raised in mother's petition to modify the child custody order entered on October 25, 2010, and

father's counterclaim.

## APPENDIX TO CUSTODY ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on all parties. Violation of any of these rules could become the subject of contempt proceedings before this court , or could be grounds for modification of this order. Custody orders are civil court orders and are not enforceable by police or other law enforcement. The word "child" is used below, but these rules apply to all the children in the order. If any of these general rules conflict with any specific provisions of the order, the order shall control.

1. In addition to the rights in the order, all parties shall also have the following rights with respect to the child:

A. The right to reasonable telephone contact with the child when they are in the other party's custody.

B. The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain information directly from the child's school or medical practitioner.

C. The right to be informed in advance before any important decision is made concerning the child and the opportunity to participate in those decisions.

2. In the event of any serious illness of the child at any time, the party then having custody of the child shall immediately communicate with the other parties by telephone or by any other means, informing the other parties as to the nature of such illness. During such illness, each party shall have the right to visit the child as he or

she desires consistent with the proper medical care of the child.

3. None of the parties shall alienate or permit an attempt by anyone else to alienate the child from the other parties. While in the presence of the child, none of the parties shall make any remarks or do anything which is derogatory or uncomplimentary to the other parties and it shall be the duty of each party to uphold the other parties as ones the child should respect and love.

4. Both parties shall provide each other with the addresses and telephone numbers of where they will be staying anytime they take a trip with the child out of the jurisdiction of Berks county in excess of three (3) days.

5. The parties shall not conduct arguments or heated conversation in the presence of the child or when the child can overhear the argument.

6. The parties shall at all times consider the child's best interests, and act accordingly, it is in a child's best interest for the parties to understand that the child is trying desperately to cope with the fact of his or her parents' separation, and needs help in loving both parents and any other involved parties.

7. Neither party shall question the child as to the personal life of any other party except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on any other party. It is harmful to a child to be put in the role of spy.

8. The parties should remember that they cannot teach the child proper moral conduct if that party is indulging in improper conduct. Children are quick to recognize

hypocrisy, and the party who maintains a double standard will lose the respect of the child.

9. Weekend and evening custody shall be subject to the following general rules:

A. Arrangements should be worked out beforehand between the parties without forcing the child to make choices and run the risk of displeasure. However, the child shall be consulted as to their schedules when appropriate.

B. Custodial rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other parties and to the needs and desires of the child.

C. If a party finds himself or herself unable to pick up or drop off the child at the designated or agreed to time, he or she should give immediate notice to the other parties to avoid subjecting the child to unnecessary worry or failed expectations.

D. The party having custody of the child should prepare them both physically and mentally for the transfer of custody to another party and should have them available at the time and place designated in the order or mutually agreed upon.

E. If any party or the child has plans which conflict with their scheduled custodial time and they wish to change their custodial time, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and the parties

should be flexible for the sake of the child.

F. If a party shows up to begin their custodial time with the child and the party is under the influence of alcohol or drugs, the custodial time may be considered forfeited on those grounds alone.

10. If any party feels that another party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.